Filed 3/21/25  Hernandez v. Volkswagen Aktiengesellschaft CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BLANCA HERNANDEZ et al.<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>VOLKSWAGEN AKTIENGESELLSCHAFT,<br><br>    Defendant and Respondent. | A168869<br><br>(Alameda County<br>Super. Ct. No. RG21102984) |

Plaintiffs challenge the trial court's order granting the motion to quash service of the summons on defendant Volkswagen Aktiengesellschaft (VWAG) for lack of personal jurisdiction.  Plaintiffs argue that VWAG's contacts with California are sufficient to support the trial court's exercise of specific personal jurisdiction — in particular VWAG's indirect but systematic efforts to serve the California market for Volkswagen cars and products through its exclusive importer Volkswagen of America, Inc. (VWoA).  Plaintiffs further argue that their claims relate to these contacts, and VWAG fails to show that the exercise of personal jurisdiction over it would be unreasonable.  We agree and reverse.

## BACKGROUND

Per the operative complaint, plaintiffs are the widow and adult children of the deceased, Raul Hernandez (Hernandez), and plaintiff Blanca

1

Hernandez is his successor-in-interest under Code of Civil Procedure sections 377.11, 377.20, and 377.30.

Plaintiffs allege that Hernandez died from mesothelioma, which he developed because of exposure to asbestos over a 40-year career as an automobile mechanic, including exposure to asbestos-containing brake shoes, brake pads, clutch plates, gaskets and transmission bands while working on Volkswagen cars between 1969 and 1976 at Volkswagen dealerships. Plaintiffs assert causes of action for strict products liability, negligence, and fraud against VWAG and its current New Jersey subsidiary, Volkswagen Group of America, Inc., among other defendants.

VWAG specially appeared and filed a motion to quash service of summons (the motion), arguing that the court did not have personal jurisdiction over it because VWAG did not purposefully avail itself of the California market. VWAG contended that only VWoA, VWAG's exclusive importer for the United States from 1956 to 1980, served the California market during the relevant time period.

Along with its motion, VWAG submitted a declaration from its General Manager Corporate IP, Silke Katharina Reinhold, with the following information. VWAG is a German company with operations, including designing and manufacturing Volkswagen vehicles, in Germany; Volkswagen vehicles are "later exported [to] VWAG's subsidiaries and/or independent importers throughout the world, including [VWoA]." From 1956 to 1980, VWAG did not conduct business in California; it was not registered, licensed or authorized to do business in California; it did not have a mailing address, telephone number, or agent for service of process in California; it did not own property or pay taxes in California; and it did not maintain any offices, or employ anyone, in California. VWAG "did not sell vehicles or genuine

2

Volkswagen replacement parts in California, nor did it implement or control any distribution system in California." VWAG did not exercise day-to-day control over VWoA, any authorized Volkswagen distributor who sold cars to dealerships in California, or any authorized Volkswagen dealership in California. VWAG did not direct or control VWoA's decisions concerning which vehicles VWoA would sell into California. Finally, VWAG did not design or manufacture vehicles or genuine replacement parts "exclusively for the California market."

Plaintiffs opposed the motion and sought jurisdictional discovery. In support of their opposition, plaintiffs submitted the following evidence that they argued established purposeful availment: a VWAG corporate history document from 2015 entitled, " 'From the Beetle to a Global Player. Volkswagen Chronicle' "; excerpts from VWAG's Annual Reports from the 1960s and 1970s; deposition testimony from VWAG's corporate representative in another case, along with some importer agreements between VWAG and VWoA; California Air Resource Board (CARB) exhaust-emission certificates for Volkswagen cars from the 1970s; and 1986 correspondence on VWoA letterhead to the EPA discussing asbestos regulation and asbestos use in Volkswagen products. Plaintiffs argued that VWAG and its subsidiaries purposefully supplied Volkswagen products to California.

The trial court continued the motion to allow for limited jurisdictional discovery.

After completing a round of written jurisdictional discovery, plaintiffs filed supplemental opposition papers. They argued their "most significant" new evidence was the VWAG-VWoA importer agreements from 1967, 1969, 1971, and 1973 (the importer agreements, or contracts), which showed

3

purposeful availment because they established that VWAG and VWoA together purposefully supplied the California market with Volkswagen vehicles and replacement parts. Plaintiffs highlighted that the contracts: (1) made VWoA the exclusive supplier for Volkswagen products in Alaska, Hawaii, and the continental United States, including California; (2) required VWoA to promote and sell Volkswagen products in California; and (3) dictated that VWoA was required to establish office employees and business fieldmen and to set up a dealership network for solicitation.[1] Alternatively, plaintiffs requested leave to pursue written discovery and a deposition on certain topics, including VWAG and VWoA statements and inter-company communications regarding the California market, California dealer network, and California service network for Volkswagen products.

The trial court again continued the motion to allow for additional limited jurisdictional discovery with the following observations: while language in the importer agreements "required VWoA to establish facilities to solicit sales of Volkswagen vehicles to 'all potential customers' in the United States . . . [that] requirement [was not] sufficient to show VWAG's purposeful availment of the California market within the meaning of case law." Nonetheless, the court observed that Articles 3 and 5 of the importer agreements allowed VWAG to retain some control over how VWoA conducted

[1] In their opposition papers below, plaintiffs also argued that purposeful availment was established by (1) CARB executive orders approving exhaust emissions control systems for Volkswagen cars sold in California and related evidence regarding the development of emissions testing standards; (2) reports showing that VWAG conducted audits on the business of Vorelco of California, a subsidiary of VWoA based in California; and (3) evidence relating to the shipment of Volkswagen cars into California. Given our disposition, we need not discuss this evidence in detail or address the trial court's determinations with respect thereto.

4

business, so the court allowed written discovery regarding inter-company communications between VWAG and VWoA regarding the market, dealership network, and service network in California during the relevant period.

Plaintiffs filed another set of supplemental opposition papers following written discovery, including a 1972 VWoA monthly market report to VWAG and a 1974 VWoA letter sending VWoA's yearly financial statements to VWAG.

After hearing argument, the trial court ruled on the motion. As relevant here, the court stated that it had determined in earlier orders that plaintiffs' previously-submitted evidence was insufficient to justify the exercise of personal jurisdiction; the court further determined that plaintiffs' newly-submitted evidence failed to establish that VWAG exercised day-to-day control over VWoA.

Plaintiffs timely appealed.

## DISCUSSION

### I. Standard of Review

The question of jurisdiction is " ' "in essence, one of law." ' " (*SK Trading Internat. Co., Ltd. v. Superior Court* (2022) 77 Cal.App.5th 378, 387 (*SK Trading*).) When the facts giving rise to jurisdiction conflict, the trial court's factual determinations are reviewed for substantial evidence, but we independently review the legal significance of the facts. (*Ibid.*) When jurisdictional facts are not in dispute, we review de novo the legal question of whether defendant is subject to personal jurisdiction. (*Ibid.*)

Here, plaintiffs contend that independent review applies whereas VWAG contends that the trial court made certain factual findings that are entitled to deferential review. Because our resolution of the personal jurisdiction question in this case does not turn on the factual findings

5

identified by VWAG and is instead based on undisputed evidence, we review this matter de novo.

## II. Specific Jurisdiction

California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the United States Constitution. (Code Civ. Proc., § 410.10; *Daimler AG v. Bauman* (2014) 571 U.S. 117, 125.) A California court may exercise personal jurisdiction over a defendant where that defendant has such minimum contacts with the state that the assertion of jurisdiction " 'does not offend traditional notions of fair play and substantial justice.' " (*Ford Motor Co. v. Montana Eighth Judicial Dist. Court* (2021) 592 U.S. 351, 358 (*Ford Motor*).) " 'Minimum contacts' may support either general (also called 'all-purpose') jurisdiction or specific (also called 'case-linked') jurisdiction." (*SK Trading*, *supra*, 77 Cal.App.5th at p. 386; *Ford Motor*, at p. 358.)

Only specific jurisdiction is at issue here. "As a general rule, the sovereign's exercise of power requires some act by which the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,' [citation], though in some cases, as with an intentional tort, the defendant might well fall within the State's authority by reason of his attempt to obstruct its laws. In products-liability cases . . . it is the defendant's purposeful availment that makes jurisdiction consistent with 'traditional notions of fair play and substantial justice.' " (*J. McIntyre Machinery, Ltd. v. Nicastro* (2011) 564 U.S. 873, 880 (*J. McIntyre*), (plur. opn. of Kennedy J.).) The plaintiff's claims must also be related to or arise out of the defendant's forum contacts, and the exercise of personal jurisdiction must comport with fair play and substantial justice. (*SK Trading*, *supra*, 77 Cal.App.5th at p. 387.)

6

### III. Purposeful Availment

" 'The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum. [Citation.] Thus, the ' "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts [citations], or of the "unilateral activity of another party or a third person." [Citation.]' [Citation.] 'When a [defendant] "purposefully avails itself of the privilege of conducting activities within the forum State," [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.' " (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269.)

The parties dispute purposeful availment. Plaintiffs argue that VWAG purposefully directed its activities and products to California by means of its contractual obligations with VWoA, and "did not merely place its vehicles into the stream of commerce" with the understanding the products might end up in California. They invoke the oft-cited language from *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 (*Woodson*): "[I]f the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly

7

defective merchandise has there been the source of injury to its owner or to others."

VWAG, on the other hand, points to VWoA and contends that the importer agreements show that VWoA, not VWAG, marketed and sold Volkswagen vehicles in California while VWAG was merely aware of this activity. VWAG claims that plaintiffs are advocating for use of the "stream-of-commerce test" described by Justice Brennan in his concurrence in *Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 116 (*Asahi*), a test under which — according to VWAG — purposeful availment may be established by a manufacturer's placement of product in the stream of commerce with awareness that its product could reach the forum state. VWAG contends that plaintiffs' position contradicts the controlling authority of *J. McIntyre*.

### A. *Relevant Law*

We begin our analysis with an overview of the relevant jurisprudence relied on by the parties.

In *Woodson*, *supra*, 444 U.S. 286, the plaintiffs brought a products liability suit in Oklahoma after they got into an accident there with a car they purchased in New York. (*Id.* at p. 288.) They sued the car's manufacturer (Audi), national importer (VWoA), and two New York-based entities, a local distributor and retail dealer. (*Ibid.*) The high court held that Oklahoma could not exercise personal jurisdiction over the local dealer and retailer because they had no connection to Oklahoma and jurisdiction could not be based only on the foreseeable act of the plaintiffs driving the car to Oklahoma. (*Id.* at pp. 287, 291.) The court contrasted a scenario that would

8

give rise to personal jurisdiction over Audi and VWoA[2]: "[I]f the sale of a product of a manufacturer or distributor such as Audi or [VWoA] is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." (*Id.* at p. 297.) While "technically 'dicta,' " the high court has repeatedly endorsed this conclusion and has described the "Audi/[VWoA] scenario as a paradigm case" of specific jurisdiction. (*Ford Motor, supra*, 592 U.S. at p. 364; see also *id.* at p. 363 ["Or said another way, if Audi and [VWoA's] business deliberately extended into Oklahoma (among other States), then Oklahoma's courts could hold the companies accountable for a car's catching fire there"].)

The high court next addressed purposeful availment in a "stream of commerce" products liability case in *Asahi, supra*, 480 U.S. 102, 105. There, a California plaintiff sued a Taiwanese motorcycle tire tube manufacturer in state court, and the Taiwanese manufacturer filed a cross-complaint for indemnity against Asahi, the Japanese manufacturer of the tire tube's valve assembly. (*Id.* at pp. 105–106.) The record did not include a contract between Asahi and the Taiwanese manufacturer. (*Id.* at p. 107.) And, other than the fact that Asahi sold valve assemblies to the Taiwanese manufacturer who then sold finished tire tubes incorporating valve assemblies into California, Asahi had no contact with California. (*Id.* at pp. 106–107.) The California Supreme Court held that Asahi's intentional act of placing its components into the stream of commerce, coupled with its

_____

[2] Audi did not challenge personal jurisdiction, and VWoA dropped its initial challenge. (*Woodson, supra*, 444 U.S. at p. 288, fn. 3.)

awareness that some of the components would eventually find their way into California, established sufficient minimum contacts with California for the state court to exercise personal jurisdiction. (*Id.* at p. 108.) A majority of the justices in *Asahi* agreed that the exercise of jurisdiction would be unreasonable and reversed (*id.* at pp. 113–116); however, the justices split on the question of whether Asahi had sufficient minimum contacts with California.

Writing for a four-member plurality, Justice O'Connor observed that some courts after *Woodson* had exercised personal jurisdiction based on no more than a defendant's act of placing product in the stream of commerce, while others had required an act more purposefully directed at the forum State — "something more." (*Asahi, supra*, 480 U.S. at pp. 110–111 (plur. opn. of O'Connor, J.).) The plurality adopted the latter position. "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." (*Id.* at p. 112.) The required "minimum contacts must [instead] come about by *an action of the defendant purposefully directed toward the forum State*." (*Ibid*.) Justice O'Connor proposed certain acts that could constitute "something more" (*id.* at p. 111) —"for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." (*Id.* at p. 112.)

Justice O'Connor concluded that Asahi had not engaged in an additional purposeful act. "Asahi [did] not do business in California. It ha[d] no office, agents, employees, or property in California. It [did] not advertise or otherwise solicit business in California. It did not create, control, or

10

employ the distribution system that brought its valves to California. Cf. *Hicks v. Kawasaki Heavy Industries* [(M.D. Pa. 1978)] 452 F.Supp. 130. There [was] no evidence that Asahi designed its product in anticipation of sales in California." (*Asahi, supra*, 480 U.S. at p. 112 (plur. opn. of O'Connor, J.).) She contrasted Asahi's situation to that in *Hicks*, wherein the Pennsylvania federal court exercised personal jurisdiction over a foreign manufacturer that sold its motorcycles F.O.B. Japan to an American subsidiary distributor who acted as "the exclusive sales agent" for the manufacturer's product in the continental United States and resold the motorcycles to Kawasaki dealership in Pennsylvania. (*Hicks*, at pp. 132–135.)

Justice Brennan's four-member concurrence in *Asahi* "[saw] no need" for the plurality's " '[a]dditional conduct' " requirement: "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State." (*Asahi, supra*, 480 U.S. at p. 117 (conc. opn. of Brennan, J.).)

Finally, Justice Stevens found "the volume, the value, and the hazardous character" of the product affects the " 'purposeful availment' "

11

determination. (*Asahi, supra*, 480 U.S. at p. 122 (conc. & dis. opn. of Stevens, J.).)

The high court next addressed purposeful availment in a products liability case in *J. McIntyre, supra*, 564 U.S. 873. There, the plaintiff was injured by a machine manufactured in England and sold by a distributor to the plaintiff's employer in New Jersey. (*Id.* at p. 878.) The jurisdictional claim centered on the following facts: The manufacturer permitted an independent Ohio-based distributor to sell its machines in the United States; the manufacturer attended annual conventions in some States with the distributor, but none in New Jersey; one machine ended up in New Jersey; the manufacturer held a United States patent; and the distributor structured its advertising and sales efforts in accordance with the manufacturer's " 'direction and guidance whenever possible' " and may have sold some machines on consignment. (*Id.* at pp. 878–879, 888, 896.) The New Jersey Supreme Court held that "a foreign manufacturer of a product" was subject to personal jurisdiction in New Jersey's courts "so long as the manufacturer 'knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.' " (*Id.* at p. 877.)

Writing for the four-member plurality, Justice Kennedy disagreed. "The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign. In other words, the defendant must 'purposefully avai[l] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " (*J. McIntyre, supra*, 564 U.S. at p. 882 (plur. opn. of Kennedy, J.).) The transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have *targeted* the forum; the fact that

12

a defendant might have predicted that its goods would reach the forum was insufficient. (*Ibid.*) Justice Kennedy went on to explain that, because "[t]he principal inquiry" was whether the defendant's activities manifest an intention to submit to the power of a sovereign (*ibid.*), "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis." (*Id.* at p. 884.) "Because the United States is a distinct sovereign" a defendant may have purposeful contacts with the United States, but not with any particular State. (*Ibid.*) Justice Kennedy then found that the "[manufacturer] directed marketing and sales efforts at the United States." (*Id.* at p. 885.) However, because the facts revealed at most "an intent to serve the U.S. market, but . . . not . . . that [the manufacturer] purposefully availed itself of the New Jersey market," the exercise of jurisdiction was improper. (*Id.* at p. 886.)

Justice Breyer's controlling concurrence (joined by Justice Alito) provided the narrowest grounds for the decision. (*Marks v. United States* (1977) 430 U.S. 188, 193 [when an opinion does not command a majority, the controlling holding is the position of the judges who concurred on the narrowest grounds].) Justice Breyer believed that precedent determined the outcome of the case. (*J. McIntyre, supra,* 564 U.S. at p. 887 (conc. opn. of Breyer, J.).) Emphasizing the single New Jersey sale, Justice Breyer recognized that precedent "strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." (*Id.* at pp. 888–889.) He concluded that "the relevant facts found by the New Jersey Supreme Court show no 'regular . . . flow' or 'regular course' of sales in New Jersey; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else." (*Id.* at

13

p. 889.) "In the context of this case," Justice Breyer could not agree with the "absolute approach" of the New Jersey Supreme Court that "a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.' " (*Id.* at pp. 890–891.)

After *J. McIntyre*, California courts have recognized that "[a]n inquiry into a foreign defendant's purposeful availment of the forum state's benefits must find more than merely entering a product into the stream of commerce with knowledge the product might enter the forum state." (*Bombardier Recreational Products, Inc. v. Dow Chemical Canada ULC* (2013) 216 Cal.App.4th 591, 602; see *Dow Chemical Canada ULC v. Superior Court* (2011) 202 Cal.App.4th 170, 179.)

Most recently, in *L.W. v. Audi AG* (2025) 108 Cal.App.5th 95 (*Audi AG*), our colleagues in the Third District addressed a case very similar to ours under a stream of commerce theory, and held that a California court could exercise jurisdiction over a foreign car manufacturer. There, the defendant Audi AG (Audi) manufactured cars in Germany and used an exclusive American company, Volkswagen Group of America Inc. (VWGoA), to import, market, and sell those vehicles to authorized Audi dealerships across the United States. (*Id.* at pp. 100–101.) Audi had no direct operations in California, VWGoA had "complete and exclusive decision making authority, control, discretion, and oversight concerning which Audi-manufactured vehicles will be delivered, marketed, and sold in California," and Audi did not exercise day-to-day control over VWGoA. (*Id.* at p. 102.)

After reviewing the relevant United States Supreme Court jurisprudence, our colleagues held that Audi had established sufficient

14

minimum contacts with California because "Audi, through its distributor VWGoA, intentionally placed its vehicles into the regular flow of commerce to the United States, including to California." (*Audi AG*, *supra*, 108 Cal.App.5th at p. 114.) "Applying the relevant criteria, the minimum contacts standard is met under the rule announced in [*Woodson*]. ([*Woodson*], *supra*, 444 U.S. at pp. 297–298.) The assertion of specific jurisdiction over Audi is also proper under the stricter steam-of-commerce plus approach articulated by Justice O'Connor in *Asahi*. (See *Asahi*, *supra*, 480 U.S. at pp. 112–113, (plur. opn. of O'Connor, J.) [marketing a product through a distributor who has agreed to serve as the sales agent in the forum state is the type of 'additional conduct' necessary to establish specific jurisdiction under the stream-of-commerce plus approach].) . . . *J. McIntyre* also confirms that, at a minimum, a plaintiff trying to establish personal jurisdiction over a foreign manufacturer must show a ' "regular . . . flow" ' or ' "regular course" ' of sales in the forum state, and*/or* some additional efforts directed toward the forum state, such as 'special state-related design, advertising, advice, [or] marketing.' (*J. McIntyre*, 564 U.S. at p. 889 (conc. opn. of Breyer, J.).)" (*Audi AG*, at p. 114.)

### B.   Analysis

Applying the relevant authority to the undisputed facts here, we conclude that VWAG purposefully availed itself of the California market through the contractual obligations it created with VWoA and its indirect, systematic service of the California market through VWoA.

15

We conclude on de novo review[3] that the contracts *required* VWoA to promote and sell Volkswagen products, and to arrange for customer service, in California. VWoA's territory was "the States of Alaska and Hawaii" and "the continental United States" — hence the contiguous States, including California. (Contracts, Art. 2(1).)[4] The contracts state that "[VWoA] assumes the responsibility within the [continental United States and the States of Alaska and Hawaii] for the promotion and sale of VW Products, as well as the supply of VW Parts and the customer's service for VW Products, and shall concentrate its efforts primarily in the territory." (Art. 2(3); see also Art. 6(1) [requiring VWoA to arrange for "excellent customer's service" for all Volkswagen car owners in its territory].) VWoA had to "arrange for the efficient promotion of VW Products," and safeguard and promote "in every possible way" VWAG's interests. (Art. 3(3).) VWoA was required to "give due consideration to all reasonable directives and suggestions of VW[AG]" relating its promotion and sale of Volkswagen products. (Art. 3(3).) And

---

[3] Plaintiffs submitted the importer agreements below and argued that the contracts established purposeful availment. Plaintiffs argued specifically that the contracts required VWoA exclusively to promote and sell Volkswagen products in California, and to establish office employees, business fieldmen, and a dealer network to secure solicitation of all potential customers. VWAG responded that the importer agreements "in fact set forth the duties and responsibilities of both of the parties to the contract," but the contracts failed to establish purposeful availment because they showed that VWoA, not VWAG, conducted all sales and marketing and imported Volkswagen products. Neither party argued below that the agreements were ambiguous, nor do they do so on appeal, so the interpretation of the agreements is a question of law. (*Colaco v. Cavotec SA* (2018) 25 Cal.App.5th 1172, 1200.)

[4] All subsequent references to Article are to the Articles of the importer agreements dated December 31, 1967; December 31, 1969; December 31, 1971; and December 31, 1973, individually and collectively.

16

VWAG reserved the right "at any time" to change and subtract from VWoA's territory if, for example, VWoA was not, "in the opinion of VW[AG]," sufficiently promoting the sale of Volkswagen products or the customer's service. (Art. 2(2).)

The importer agreements also required VWoA to establish a dealership network for customer solicitation, which VWAG essentially conceded in briefing below: "For its part, VWAG wanted to ensure that VWoA, to whom VWAG granted an exclusive license in the United States under the contract, would make efforts to maximize sales of the Volkswagen vehicles it purchased from VWAG in Germany, which included VWoA establishing a dealer network." The contracts state that VWoA "will appoint at locations to be approved by VW[AG] such number of dealers as may correspond to the requests of VW[AG,]" and VWoA's contracts with dealers "will impose" duties and obligations corresponding to those assumed by VWoA in the importer agreements. (Art. 3(4).) To the extent that VWoA's sales structure included distributors or authorized shops "in addition to dealers," the provisions of the importer agreements applicable to dealers and to their relationship with VWoA were to be applied "according to their essential meaning" to those distributors and shops, as well as to the relationship between distributors and the dealers they appointed. (Art. 21.)[5] VWoA was further obligated to employ the number of office employees and business fieldmen "sufficient in the opinion of VW[AG]" to secure the solicitation by dealers "of all potential customers for VW Products in the territory." (Art. 5(3).)

Next, VWoA assumed many obligations with respect to structuring the dealership network, including the obligation to pass down VWAG directives.

_____

[5] Approximately six pages from the 1969 contract, including Article 21, appear to be missing from the record.

17

VWoA had to ensure that Volkswagen dealers maintain a salesroom, a repair shop, and an inventory of VW parts. (Arts. 3(4), 6(2), 21.) VWoA had to see to it that dealers "will be subject to and will duly perform duties corresponding to the duties of [VWoA] pursuant to [Article 5(2)]" — which included the duties to display a sufficient number of Volkswagen signs in accordance with VWAG's directives and to use VWAG's requested stationery and business forms. (Arts. 5(4), (2), & 21.) And VWoA had to relay to dealers "all directives and suggestions of VW[AG] to the extent that they may concern dealers, without making any changes in substance" and to "see to it that the dealers . . . give due consideration to the said directives and suggestions." (Arts. 3(4), 21.)

VWoA also had to make sure that its personnel and that of Volkswagen dealers would be "thoroughly trained" and "thoroughly instructed about all new suggestions of VW[AG] for the servicing and repair of VW products." (Arts. 6(2), 21.) And in the dealers' operation of the repair shops, the importer agreements required that "due consideration . . . be given to the directives and suggestions which may from time to time be issued by VW[AG]" with respect to: the size and installation of repair shops; the sufficient advertising of "the location of the repair shop through Volkswagen customer's service signs prescribed by VW[AG]"; the procurement and maintenance of special Volkswagen tools and equipment and "at least one complete set of Volkswagen customer's service literature per repair shop"; the employment and training of qualified personnel; and the correct execution of repair work. (Arts. 6(3), 21.) VWoA also had to ensure that dealers delivered an owner's manual to the purchaser of all Volkswagen products for which a manual was issued, and, per VWAG's directive, the first maintenance service on a Volkswagen vehicle had to be free for the customer. (Art. 6(4) & (5), 21.)

18

It is undisputed that Volkswagen dealers with repair shops operated in California during the relevant time period.  There is also undisputed testimony from VWAG's corporate representative that VWAG passed down repair guidelines to dealers.  The record further reflects that VWAG believed that the long-term success of its products required customer service centers with well-trained personnel and tools.

Finally, it is undisputed that VWoA engaged in a regular course of sales into California during the relevant time frame.  In VWAG's own words, "Plaintiffs' evidence shows considerable availment by VWoA to the California market in particular."

On this record, we reject VWAG's contention that it merely placed its product into the stream of commerce with awareness that the product would reach California.  "[S]omething more" exists here.  (*Asahi*, *supra*, 480 U.S. at pp. 111–112 (opinion of O'Connor, J.).)  VWAG intentionally entered into contracts that required VWoA to market and sell the products, and to arrange for dealers and customer service, in California; VWAG created the structure of the distribution network at issue where VWoA served as the exclusive sales agent for Volkswagen products in California; VWAG employed the distribution network to sell its products; it created and used a channel to the California dealers that interfaced with consumers; and VWAG issued repair directives through that channel.  The evidence likewise shows a regular course of sales in California.  (*Id.* at p. 117 (Brennan, J., concurring in part and concurring in judgment) [jurisdiction should lie where a sale in a State is part of "the regular and anticipated flow" of commerce].)  The facts here squarely fit the "paradigm case of specific jurisdiction" (*Ford Motor*, *supra*, 592 U.S. at p. 364): "[I]f the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence,

19

but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in [several or all] other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." (*Woodson*, *supra*, 444 U.S. at p. 297; see also *Audi AG*, *supra*, 108 Cal.App.5th at p. 114.) We conclude that, through its intentional acts, VWAG sought to serve the California market through VWoA.

VWAG disputes the conclusion we reach for several reasons, but we find none of its arguments persuasive.

VWAG contends a purposeful availment finding hinges on a determination that VWAG exercised day-to-day control of VWoA. In support of this argument, however, VWAG cites authorities discussing the day-to-day control required for the exercise of general jurisdiction over a parent corporation based on the activities of its subsidiary under the agency and representative services doctrines. (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 119–121; *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 542 (*Sonora Diamond*).) We find VWAG's citations inapposite given that general jurisdiction is not at issue here, and we do not believe the law requires VWAG to have had pervasive day-to-day control over VWoA to exercise specific jurisdiction over VWoA in the context of this case.

VWAG also emphasizes that "[a] mere parent–subsidiary relationship is not enough to exercise personal jurisdiction over the parent." "The question [where specific jurisdiction is at issue is] . . . whether the parent for all intents and purposes has done an act in the forum state of a nature as to make reasonable the forum state's exercise of jurisdiction over the parent with respect to that act and its consequences . . . . The critical acts may be

20

taken directly by the parent or indirectly through the subsidiary, but in all events must be attributable to the parent corporation itself." (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 552.)  As discussed above, given VWAG's purposeful engagement of VWoA to market and sell its product in California, there is more than a mere parent-subsidiary relationship here.

Finally, VWAG contends that, after *J. McIntyre*, a foreign manufacturer cannot be subject to personal jurisdiction in a forum State merely because it uses a nationwide distributor.  *J. McIntyre*'s controlling concurrence rejected such an "absolute rule" (*J. McIntyre*, *supra*, 564 U.S. at pp. 890–892 (conc. opn. of Breyer, J.)), but the concurrence did not conclude that personal jurisdiction *can never* be exercised in a case where a manufacturer contracts with a nationwide distributor.  In this case, VWAG's acts show that it sought to serve the markets in the 48 contiguous States, including California, and the markets of Alaska and Hawaii through VWoA, and the evidence shows VWoA's conduct in California and a " 'regular . . . flow' " or " 'regular course' " of California sales.  (*Id.* at pp. 888–889 (conc. opn. of Breyer, J.).)  The exercise of specific jurisdiction in this case does not run afoul of the controlling holding in *J. McIntyre*, which, as explained above, involved a nationwide distributor but only a single sale to the forum state of New Jersey.  (*Ibid.*)

## IV.   Relatedness

The relatedness prong is satisfied by claims that either " 'arise out of' " or " 'relate to' " the defendant's forum contacts.  (*Ford Motor*, *supra*, 592 U.S. at p. 361, italics omitted.)  The trial court did not address whether plaintiffs' claims arise out of or relate to the forum contacts that we have found here; plaintiffs, however, urge us to decide this prong as a matter of law.  For its part, VWAG does not address or dispute the relatedness prong based on in-

forum contacts flowing from the importer agreements, nor does VWAG identify any disputed issues of fact under this prong. As such, we will decide this issue of law on the undisputed evidence. (*SK Trading*, *supra*, 77 Cal.App.5th at p. 387.)

As set forth above, VWAG's forum contacts were its acts to continually serve the California market with its product through VWoA, and VWoA undisputedly sold Volkswagen products and established dealerships and repair shops in California during the relevant timeframe. It is undisputed that Hernandez performed mechanical work on brakes, clutches, and gaskets of Volkswagen cars at California Volkswagen dealerships from 1969 to 1976. Plaintiffs allege that Hernandez's mesothelioma was caused by his exposure to asbestos while working on the brakes, clutches, and gaskets of Volkswagen cars at dealers in California. Where VWAG systematically — albeit indirectly — "served a market in [California] for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States[,] . . . there is a strong 'relationship among the defendant, the forum, and the litigation' — the 'essential foundation' of specific jurisdiction." (*Ford Motor*, *supra*, 592 U.S. at p. 365; see also *Audi AG*, *supra*, 108 Cal.App.5th at pp. 116–117.) Following *Ford* and *Audi AG*, we find the relatedness prong met.

## V. Fair Play and Substantial Justice

VWAG has not established that the exercise of jurisdiction over it would be unreasonable. (*Audi AG*, *supra*, 108 Cal.App.5th at p. 118.) VWAG's only argument on this prong is that it is a foreign corporation that "conducted no relevant activities [in California]," so the exercise of personal jurisdiction over it "is . . . unreasonably burdensome." Given VWAG's efforts to serve the California market indirectly through VWoA, it should have reasonably anticipated being required to defend those activities in a

California court.  VWAG has not established that the assumption of jurisdiction over it is unfair or unreasonable.  (*Id.* at pp. 118–119.)

## DISPOSITION

The judgment is reversed.


BROWN, P. J.

WE CONCUR:

STREETER, J.
SIMONDS, J.*


*Hernandez et al. v. Volkswagen Aktiengesellschaft* (A168869)

---

* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.